The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. You may be seated. Ms. Fagan. You may be seated. You may be seated. Good morning, Your Honors. May it please the Court, Amelia Dagan, Pro Bono Counsel for Petitioner, Mr. Melvin Funez-Ortiz. In this case, the IJ properly granted Mr. Funez deferral under the Convention Against Torture, where Mr. Funez is one of six brothers, all of whom have been threatened, tortured, shot, or killed by Los Chirizos. Specifically, the IJ found that a Honduran military police officer accompanied and stated full support for Los Chirizos at multiple instances of torture. She found that this all occurred in a country where law enforcement and the gangs are, quote, essentially the same. The Board erroneously reversed the IJ's findings on internal relocation and acquiescence by applying the wrong legal standard, which infected all subsequent review of the IJ's decision. On acquiescence, the Board engaged in its own fact-finding, distorted the record, and opened the door to an unworkable framework for acquiescence. On internal relocation, the Board ignored significant, unrebutted evidence regarding Mr. Funez's unsuccessful past relocation and failed to substantively analyze the possibility of future relocation. We are asking this Court to remand this case for the Board to correct their legal errors. Counsel, can I ask you about just what you said on relocation? Your view is that your client did not successfully relocate in the past? Yes, Your Honor. As the IJ found, he had not successfully relocated in the past due to the fact that he had been hunted while he was in San Pedro Sula and then continued to be pursued even after he fled Honduras. But then the IJ mostly focused, then made the ultimate substantive finding. Can I go back to the past relocation, though? Yes, Your Honor. And I don't want to seem flip about this at all. I understand that the gang was seeking your client, but they didn't find him. I mean, he was safe for six years with no contact with the gang. So how is that not a successful relocation? He was not receiving direct communication from the gang, Your Honor. However, his family was still being threatened, and he was receiving communications of that. Again, I don't doubt that the gang was after him for that six years, but they didn't get him. And isn't that usually how we think about relocation, that if you relocate and are in fact safe in the place where you have relocated, that was a successful relocation? In this case, Your Honor, this Court has not had the chance to substantively analyze internal relocation in the CAT context. But the established asylum framework, I think, is very instructive here. In ULA, this Court has stated that the applicant should not have to live in hiding. In Ortez Cruz, applicants should be able to relocate and be safe from the ones who would harm them for the rest of their lives. Doesn't the record show that his real problem occurred when he went back home to see his parents? In other words, he had been in San Pedro Sulo for six years and then decided to go home. And wasn't that when the problem started? No, Your Honor. His visit home to La Laguna was in 2012. So he had briefly left, returned that same year. That is when he was shot, and the gang followed him to Tegucigalpa, which is hours from his hometown. Right, but didn't he then relocate for six years and then went home? After that time in San Pedro Sulo, no, he did not return home, Your Honor. He fled directly to the U.S. after he picked up his son. In 2017-2018, when he received news that his brother had been almost killed. Okay, well then when was he attacked in Tegucigalpa? If you'll help me with that timeline. Oh, that was also in 2012, Your Honor. That was shortly after the shooting in his hometown. The gang followed him to Tegucigalpa, beat him to the point of unconsciousness, and to the point where he was hospitalized and left with permanent scars. And then he was able to travel on home after his hospitalization. Okay, let me ask you then a question. It seems to me it's one of two things that you're primarily arguing. Are you primarily arguing that the BIA did not discuss future relocation as a separate element, but merely relied on the past relocation? And so you're saying that procedurally they didn't do what they needed to do? Yes, Your Honor. Are you arguing in front of us that the record shows an inability to relocate? Both, Your Honor. The internal relocation aspect of this claim includes... No, which of those, or are you arguing both? Both, Your Honor. In this case, the record does support the IJ's finding that she had made that he had not been able to relocate in the past, and the IJ ignored... Apologies, the board ignored significant and unrebutted evidence regarding that ability. They didn't mention the hunt for Mr. Funes while he was in San Pedro Sula. They didn't mention anything of what had happened after he fled Honduras. But then, to Your Honor's second point, the board improperly focused their analysis only on the past without substantively analyzing the possibility of future internal relocation, and that's what's required under the regulations. The IJ had correctly balanced all the factors in her analysis. She found that Mr. Funes had not relocated in the past, but that as ultimately relevant for cat protection, he could not relocate in the future. The board committed a legal error by really only discussing the past. They concluded that he had relocated in the past on the basis of only three cherry-picked facts, and that is a factual conclusion not supported by substantial evidence. But then the regulations also don't seem to support the board's implied finding that past relocation is somehow dispositive of the ultimate question, which is whether Mr. Funes could safely relocate in the future in a country that this court has noted in the past is smaller than the state of North Carolina. And it's relevant, right, the ability to relocate safely in the past? You wouldn't say that the... Is it that the board erred by considering that at all, or that the board erred by stopping its consideration there? The error wasn't stopping there, Your Honor. Undoubtedly, past relocation is one of the many factors that the fact finder is supposed to consider in this holistic analysis of whether someone will be tortured in the future, but it's only one subpart. This court has never found that past relocation is somehow dispositive or even presumptive of the ability to relocate in the future. The government cited two cases in their briefing for this proposition that a previous relocation undermines the finding of future torture in some way. However, both were unpublished. One was from the Eighth Circuit, and the one from this circuit, Romero Donato, doesn't contain any of that language that was cited in the briefing for that premise. What if the board had said, we now proceed to discuss the issue of future relocation, and the record shows a six-year period in which he was able to relocate within the country. We consider this evidence of past relocation to be so extensive in this case to solve the question of ability to relocate in the future. What would be your argument then? That case is not before us, Your Honor, but insofar as they are saying that the past necessarily dictates the future, I think that defies logic. No, what I'm saying is, what if they had said that the extent of time that passed in which he was able to safely relocate is compelling, and we feel that this is sufficient to answer the question of future relocation. What would be your argument then? In that case, Your Honor, internal relocation is a factual finding, and thus the IJ's finding is due deference by the board. The phrasing that Your Honor just used indicated to me that the board was doing its own way, making its own factual finding of what substitutes internal relocation or not, and without giving deference to the fact that the IJ already found that he had not relocated in the past and could not in the future based on the whole record, including the fact that the board was completely silent on. See, this is getting back to my point of the remedy that you're seeking here and whether your argument is primarily procedural. In other words, the board didn't conduct the correct analysis. You're asking us to send it back for a correct analysis. Could you explain more the remedy that you're seeking and what you're asking us to tell the board on remand, if we were to agree with you? Yes, Your Honor. We are asking for remand in this case due to the legal error present from the board in terms of ignoring evidence and not substantively analyzing everything that the regulations require on internal relocation. On acquiescence, we are also asking for remand given that the board committed three legal errors of its own in that area. First, the board failed to apply clear error review in reversing the IJ's uncontested finding, even conceded by DHS, that the uniformed man who accompanied Los Chirizos was who he said he was, a government official, and he was acting under color of law. The board engaged in pure speculation on this fact when it found that this man was actually simply a gang member who possessed a military uniform. Under this court's case law, Orellana, Barajon, and many others, the board is not at liberty to distort or disregard important elements of an applicant's claim. The board is also not allowed to engage in its own fact finding but owes the IJ deference. Here, the IJ's findings were not clearly erroneous but were based off of Mr. Funes' credible testimony and his family's declarations. Even DHS conceded in their brief to the board that this man was indeed a member of the Honduran military police. This officer accompanied Los Chirizos on two separate occasions when they shot, threatened, and attempted to drown Mr. Funes' relatives to get his address. The officer clearly stated that Los Chirizos had the military police's full support in their quest to murder the Funes family. By failing to defer to the IJ's findings and engaging in their own impermissible fact finding, the board committed legal error on that matter. Can I ask you a question about the IJ's findings on that? So the IJ lists out all the factors you're supposed to consider in deciding whether someone is acting under color of law and then doesn't apply any of them, just sort of lists the factors and then says, under the circumstances, I'm finding under color of law. So the main factor is supposed to be, I think, that a person's official status is what enables them to sort of carry out this torturous conduct. What's the best evidence of that here, that this person, assuming it's, as you say, a member of the military police, that it is by virtue of his status that he's able to do this because the record is, I mean, it is a dreadful record and it kind of sounds like gang members can do this whether or not they're members of the military police. In this case, Your Honor, the IJ did list all the factors and noted, for example, that he was in uniform, he threatened retaliation through official channels. Those are all part of a matter of JGR's very holistic focus. When did he threaten retaliation through official channels? In this case, Your Honor, he was saying that there was the ability for Los Chiristas to act and do whatever they wanted and that the military police would support them. That is through the official channel of the military police supporting this violent activity. And in that case, that is what happened. So you understand the statement to be a threat of retaliation. Look, I'm with the military police. If you try to do anything about this, we will be back. Yes, Your Honor. Under acquiescence, the second legal error was that the board erred by distorting the record regarding Mr. Fuñez's engagement with the Honduran police and their acquiescence to his and his family's harm. The board stated that Mr. Fuñez, quote, never followed up after reporting the gang to the police, but this ignored Mr. Fuñez's credible testimony that while he recovered from a gunshot wound, he sent his mom on his behalf, as the police had told him he could do. The board and the IJ both acknowledged that the police went to the shooter's house once. However, the board disregarded the IJ's later finding that the police took no further action and that Los Chiristas continued to act with impunity, actually intensifying their harm of the Fuñez family after Mr. Fuñez reported the shooting to the police. But ultimately, Mr. Fuñez did not prove that the entire Honduran government would acquiesce to Los Chiristas. Such a Herculean task would violate the clear text of the regulations that require only that torture be inflicted by or with the acquiescence of a public official or another person acting in official capacity. And the IJ found more than this here. The IJ considered evidence of Mr. Fuñez's particularized risk, and she also discussed the broader context of evidence that Honduran authorities direct gang violence are involved and that the gangs have infiltrated Honduran law enforcement to the degree that they are, quote, essentially the same. The board, conversely, doesn't accurately discuss this evidence and indeed seems to chastise the IJ for analyzing both of these things, Mr. Fuñez's particularized risk and country conditions evidence, even though all of that is required under the regulations. Finally, the board erred in basing its reversal of the IJ's acquiescence finding largely on the fact that the police responded at least once to Los Chiristas' crimes. In attempting to defend this decision, the government goes a step further and argues that there can be no acquiescence if a government took any steps whatsoever to curb non-governmental violence or if the torturer has any fear of any authorities at any time. This is simply unworkable. If any government official took even the most flimsy or disingenuous step towards stopping gang violence, then under the government's test, no one from that entire country could qualify for cat relief. This court has already rejected that idea in Portillo-Flores, emphasizing that the agency must perform a proper analysis of the applicant's specific circumstances regardless of governmental, general governmental efforts to combat violence and corruption. This was also rejected in Diaz de Gomez and Ponce Flores. And this is consistent with the First, Second, Third, Seventh, and Ninth Circuits, all of whom have rejected the extreme position that mere government efforts preclude a finding of acquiescence. For example, in the First Circuit in H.H., they remanded with noting skepticism that any record evidence of efforts taken by the foreign government to prevent torture no matter how minimal would be necessary to preclude a finding of acquiescence. The Ninth Circuit has repeated this multiple times in Barajas, Romero, and Madrigal, noting that general efforts to curb gang violence are not enough on their own to defeat a finding of acquiescence. Counsel, can I go back to Judge Keenan's question? So it sounds like you are making an argument that the BIA's finding here is not supported by substantial evidence, but that is not your argument. You don't want us to say that. You want us to send it back and tell the BIA what. In this case, Your Honor, substantial evidence is not the relevant standard. These were legal errors overlooking evidence and being silent on that, engaging in their own fact-finding. I don't understand when you say, well, it seems like a very fine line between saying the BIA made a legal error in overlooking evidence and there's not substantial evidence to support what the BIA did. So are you conceding there is substantial evidence to support what the BIA did here? It's just that the BIA made some procedural errors along the way. Is that your position? Your Honor, I say them over time. May I answer this question? Yes, you may. Thank you. No, Your Honor. We believe that here there are legal errors that can be reviewed de novo by this court. However, even if this court were to find that there was no legal error, we do not believe substantial evidence supports this decision, given that, for example, on the acquiescence finding, there was nothing in the record at all to suggest that this was not a military police officer, as even DHS conceded. That's true. Why are you arguing about a bunch of procedural errors? I'm just not really understanding. I don't mean to argue your case however you want to argue your case, but if your fallback argument is there's no substantial evidence in the record to support what the BIA did here, I guess I'm not really understanding why that's not your main argument, because if we agreed with you on that, your client would prevail and would get more than just a remand to the BIA. So I don't want to keep you over your time, but if you can just sort of explain that for me, that would be really helpful. Yes, Your Honor. In this case, the factual issues are very complex, and insofar as the board might have thought that there was some need for further fact-finding or factual clarification, then they should have remanded that to the IJ, and insofar as this court does not engage in its own fact-finding, and there are disputes here about what the facts even are based on the board's own impermissible engaging in fact-finding, that is the argument. Though, to Your Honor's point, we do not believe substantial evidence supports the board's decision, even though there was legal error as well. All right. Thank you, Ms. Dagan. Thank you, Your Honor. Mr. Stanton. It's okay? Yes. All right. May it please the Court. It's important for this particular case that there is no question of what exactly the scope and standard of review is. The government's brief cites three cases in which involve this exact procedural scenario before this court where the immigration judge granted care protection, the board reversed it, and the court engaged in what we consider to be the proper standard of review. The inquiry is not whether this panel would review the immigration judge's decision, if it was reasonable, like perhaps not upheld in the first place. The inquiry is whether this panel would determine whether the board's ruling was reasonable, where any reasonable judge would do what the board did, look at the record and decide that the immigration judge clearly erred. What should we do with factual findings of the IJ? What we do with the factual findings of the IJ, I mean. In terms of the BIA changing those or having a different view. What do we do in terms of the IJ's factual findings? Is that clear? Clear? Clear or what? I mean, to the extent any deference is owed, it's all to the board, rather than to the IJ's factual findings. I mean, here the board determined that the IJ, I'm going to assume that clear error and speculation are functional equivalents. So is that correct? All right. Go ahead. To the extent that the immigration judge found that relocation was impossible, and by the way, the immigration judge got off to the wrong start by employing the wrong standard of view. She said that the record must compel finding the relocation. Let's get back, excuse me, I didn't mean to interrupt there, but let's get back to what seems to be really one of the main focuses that you and your opposing counsel have been talking about, and that's the issue of relocation. The board never discussed future relocation. It seems to me that what the board did was make an implicit finding that future relocation, that he could safely relocate. In other words, the board never actually says that in its opinion. Just a second. Of course. What the board says is the respondent has safely relocated between 2012 and 2018 when he decided to leave Honduras. Okay? The board didn't, the word future does not appear in the relocation discussion of the BIA in its opinion. It seems to me that you have to rely on an implicit finding that the BIA was saying that the evidence of past relocation is essentially very significant because of its duration in time, that that equates to the ability to safely relocate in the future. Isn't that pretty much where you're left in terms of the relocation analysis of the board? Yes. I would respectfully submit that to the extent that what you were saying is that when the board said this past relocation was successful, I mean it's a very easy jump to the conclusion, implicit, if you will, that future relocation is possible. Again, the standard is possible. I mean it's a much higher standard than it is for asylum. Yes. So, I hear all of that sort of as a logical matter, but it does seem that if that's the jump you're making in this case from past relocation to future, there's sort of a gap in the BIA's reasoning because there's new evidence that comes out after the petitioner arrives in the United States, and it turns out that the gang actually could track him across the country because they do arrive at his old address I think shortly after he leaves. Now they have found him, and whatever the limits on this gang's geographic reach were before he left, they now do include this city. And so now we know more about the gang's ability to find him. So why doesn't the BIA have to address that kind of changed circumstance? Well, I mean, to the extent they found him, they only found him because his brother told them where he was. Because they tortured his brother to find out where he was. I mean I really do think until he left, one could say the gang may be looking for him but they can't find him. But after he left, it turns out they could find him. So why isn't that sort of a change in circumstances that the BIA would have to address if it wanted to infer from past relocation that he could also relocate safely in the future? Well, petitioner also testified that he has very little family remaining in Honduras. That's on page 177. I don't know that that's a great fact for the government. The gang is systematically killing his entire family. And I think the point, you know, at least I think the point that Judge Harris is making is you have a five-year period from 2018 when he left Honduras to come to this country and the date of the BIA opinion, which is November, what, 30th? Is it 2023? I don't know the date, but no. Yeah, it has a file stamp, November 30th, 2023. So that's a five-year period. And the record's silent in terms of the BIA's analysis of what happened to the respondent, excuse me, to the petitioner during this five-year period and how that might affect the ability to safely relocate. And why wouldn't that be a basis that we would have to send it back to the board? Well, because, I mean, again, there's other record evidence that suggests that relocation is certainly indeed possible, though. So, I mean, like, again, going back to his family, he says he doesn't know where his siblings are, so he doesn't know how to get in touch with them. Like he tried, I mean, the DHS lawyer asked him, why don't you have more letters of support from your siblings who actually were present? He responded, I don't know where they are. They said that like on page 210. Mr. Stanton, doesn't the intensity of the violence against him and his family, that makes this case different? I mean, the BIA didn't even mention that. I mean, consider the fact is what Judge Harris brought up, the fact that they tortured and made his family tell where he was and they showed up at his address. That's how intense it is. Doesn't that make this case different than just he was tortured, he moved in six years, no problem? There was so much that they would torture his family members and say, like, you tell us where he is. That's an intensity that very few cases, I've been on the court almost 24 years and these immigration cases, this one is just, I mean, many a horrible one, but the intensity, I want to find him. And they found where he is, where he was. Through his brother, yes. But the BIA didn't give any consideration to that at all. His son relocated to a place where nobody else knew where he was except for Petitioner himself. I mean, there are a lot of towns in Honduras where, I mean, this gang does not operate. I mean, Petitioner argued in his opening brief that gangs are everywhere, and the immigration judge relied on that finding, relied on this, that gangs are everywhere. But the Maras, MS-13 and the Barrios don't seem to care about this guy. Los Charritos is a very, very small gang. That's in the administrative record. I mean, so, yes, they seem to care. I mean, it's possible that the BIA could say something like that, but they didn't. They didn't say, but this gang has limited geographic reach, so he'll be fine in the future. They didn't say any of that. Like, these seem like they might all be good arguments for the government to make in front of the BIA on remand, but we can't affirm on a ground that the BIA didn't address. There was the futility exception to the Chenery Doctrine, and with respect to, like, Chenery, by the way, I mean, we considered filing a short applied brief that, like, our office used Chenery as saying that, like, I mean, holdings, I mean, findings mean different things in different contexts, but that still was essence. I mean, the board says, we deny your claim because you didn't fill element A and B. Chenery prevents the government from saying, and by the way, you also, to the court, you also didn't fill element C, D, and E. We do not view Chenery as limiting the government from arguing, by the way, you didn't meet A and B based on these facts as well that were not cited by the board. We do not view Chenery as limiting the government's ability to point out why the board's ruling was supported by substantial evidence, especially on this particular case. I mean, we have to be able to respond to this theory that the gangs are everywhere, therefore relocation is impossible. No, I mean, this is not the proper inquiry. This is not a theory case. This is far from a theory case. I mean, I know you're representing the Attorney General, but this is not a theory case. Not a theory case. I'm just trying to explain why the Chenery arguments, we just don't agree with those at all. But again, all we're doing, all we're trying, with respect to the limited reach of small gang of low to zeros, all we're trying to do is explain why this theory, it's impossible because the gangs are everywhere. It's just not correct. Okay, Mr. Chenery, let's go on to the issue of the police uniform. Okay, sure. And it seems to me that the board was engaging in its own factual finding when the board said it is speculative to conclude solely on the gang members' possession of the police military uniform, that this individual was a member of the police acting under color of law. Well, the board seems to be making its own finding that this was a gang member wearing a military uniform. And what evidence is there in the record to support any finding that this was a gang member who had acquired a military uniform and was wearing it to show up at the petitioner's house? Okay. If I could direct your attention to page 163 of the joint appendix, when on direct examination he was asked who came to his brother's house in the second visit. He said, like, Elmer, the real bad guy, and other gang members. He didn't say other gang members in addition to this police officer. So it's a fair reading of the record that these people were indeed gang members. But even if he was just a criminal. But the IJ had found otherwise. The IJ found otherwise. I mean, we don't know who this guy is. All they said was he was wearing a police uniform. We don't know his name, his rank, how long he's been on the force. And there's evidence in the record that impersonating law enforcement officials is a problem in Honduras. It looks like the board's making a factual finding there, though. Most respectfully, I think what the board did was say the IJ's factual finding that this was a police officer was undoubtedly speculative and the petitioner did not meet his burden of showing this person was, in fact, a police officer. The board never says that. That's the way the government reads the board. You're filling in the blanks for the board, it seems to me. Filling in the blanks for the board. I mean, we read, like, the speculative thing, the word speculative is another way of saying you didn't meet your burden of showing these things. That's the way we read it. Anyway. Can I ask you a question about what the board said here? Because, honestly, I just literally don't know how to make sense of these two sentences together. First, the board says the immigration judge relied on the testimony that someone had a police uniform and that someone declared that the gang had the military's full support to kill his family. And then in the next sentence, the BIA says that it's speculative to conclude solely based on the uniform that he's a member of the police acting under color of law. But the BIA itself just said the IJ relied on two things, the uniform and the statement. And the statement seems, like, pretty compelling. If you're trying to show acquiescence and someone is literally saying the gang has the military's full support in killing their family members, I mean, the statement's, like, doing most of the work there, as I understand it. And then the BIA just doesn't address it at all. It says they only relied on the uniform. I literally don't get what's going on here. I believe what your honor is asking. Correct me if I'm wrong. Are you asking me if the board erred in saying that the IJ's color of law determination was speculative? I'm asking whether, I mean, the BIA did err when it said that the IJ relied solely on the gang members' possession of a military police uniform. And I guess I'm suggesting that the BIA erred by failing to address the very significant evidence that it had described in the preceding sentence, the statement. Okay. Well, I believe what the board was getting at was, I mean, by citing the JGR decision, which came out a couple of months after the immigration judge decision, I mean, the board was essentially engaging in a color of law analysis. And the board was essentially saying that, like, just wearing a military uniform and, for lack of a better word, mouthing off, making these threats that, like, the military has got the full support to kill your family, engaging in misconduct is not sufficient to show color of law. I mean, I've looked. I looked. I looked in every context. Immigration, I've looked at Federal Tort Claims Act cases. I looked at Section 1983 cases. There's a wide body of color of law. And I can't find a single decision that even remotely comes close to what Petitioner is asking right now, that, like, when you're accompanied by people who clearly are not, they're accompanied by other gang members, criminals, I mean, and engaging in terrorist acts. I mean, there's no sort of official duty here. And going back to what I said about we don't know who this guy is, is he a patrolman? I mean, a rookie patrolman saying the military's got, the gang has the full force of law to do that. I mean, if he was a commander, maybe someone who actually has that type of authority. But we just don't know anything about this guy. Because it kind of seems like that the statement would lend support to the idea both that he's actually in the police, because he's sort of at least purporting to speak for the military police, but also that he can do this because he's doing it with police support. Like, couldn't you read the statement the way your colleague does, is saying, look, the military police is in full support of what we're doing here. So, A, don't bother complaining, and B, if you do, we'll be back. I mean, it kind of seems like he's trying to leverage his official status to advance the persecution. Well, I mean, again, I can't find a single decision that supports that. If this court upholds that, I think it will be the first. Petitioner says, What you would have to do, really, is say maybe the BIA should say something about the statement. I mean, I suppose. But, I mean, again, obviously the court, I mean, you're decision-makers, so I don't think you should send it back. But for additional fact-finding, I mean, all right. But even going back to the other acquiescence, I mean, like, again, Los Chiritos is terrified of being caught by the police. And so this court has said repeatedly that when bad guys express fear of being caught, they know they can't operate with impunity. The record shows Los Chiritos members are in jail. If they have the full support of the military, why can't they do whatever they want? This is your Chenery point, again, that we could affirm on that basis even though the BIA didn't say anything about that. The BIA did say that the police were helpful and responsive. They didn't say anything about our case law and this idea that, look, if gang members are showing apprehension about being turned into the police, then the police aren't acquiescing. I mean, the BIA didn't say anything about that. The BIA did make clear that, like, there was no acquiescence here. And, again, the BIA also did say that the police were responsive to the family every time that they asked. And so, I mean, like, when one of his brothers was killed, the investigator in the corner showed up to do their duties. And when Petitioner was shot, the police did, like, attempt to go apprehend or question Felix, if I pronounce your name correctly. He wasn't home. It was too bad. And, yeah, anyway, but unfortunately Petitioner. What did the BIA say about when his mother came and made inquiries? Nothing happened. Any mention of that by the BIA at all in terms of follow-up? Was there any mention in the record in terms of BIA's decision as to following up? What the board did say was that, like, the police did not continue their investigation after Petitioner had taken off. And so the mother, yeah, did. Apparently there is the record. I know the mother did. The question is, did the BIA even acknowledge that? I don't believe the BIA actually mentioned the mother. But, I mean, again, I mean, if the police don't have a complaining witness, I mean, there's very little point to continuing an investigation. I mean, the police did tell the mother, hey, if he comes back, we'll continue with the investigation. I mean, this court said in Larios Vargas, which is cited in our brief, that, like, you need more than just being fearful of engaging with the police. How many family members have to die to be a serious matter? Family members have to die? Yeah, that's what you're saying in this record here. It's a serious matter, but we're talking, like, the police, I'm sorry, we don't know why exactly the gang shot the second brother, second one. The petitioner theorized it was Los Chiritos, that the gang shot the first brother or burned down his house because he refused to pay extortion. So neither one of which has anything to do with the petitioner. So just is it the government's position, I guess it is, that the petitioner could have safely, after he was shot, returned home and gone to the police station, that he could have safely done that?  Yes, I mean, so, I mean, the police seem to be responsive to him. And so, I mean, it's his burden to show that they were not acquiesced. So, I mean. I guess I'm not really asking about acquiescence. I'm talking about the part where the mother is told, like, we won't pursue this unless your son comes back to a town where he was just shot and where his family members are being systematically burned, raped, and murdered, and shows up at the police station. That's what he needs to do. And the government's position is he could have safely done that. I'm not talking about acquiescence. I'm just talking about his odds of surviving that trip to the police station. So, I mean, my time is up. Can I answer? Please answer that.  All right. So, yes. I mean, our position is the petitioners must meet their burden to show, like, lack of governmental acquiescence. We can't speculate. We can't speculate. Like, the cases that he cites, I mean, like, were a lot more, like, there was a lot more extensive evidence of governmental intertwined with the gangs. And so, they were personal to that actual petitioner. Laris Vargas spells this out. It's a 2023 decision cited in our brief. So, I mean, you need more than a belief that reporting to police would be too dangerous to argue futility. So, but, I mean, again, the police, I mean, like I said earlier, there's very little point in continuing the investigation if they don't have a complaining witness to see the case to justice. So. All right. Thank you, Mr. Denton. Megan, you have some time reserved. Thank you, Your Honor. Three points on rebuttal, Your Honor. First, regarding internal relocation, the board was wholly silent on critical and unrebutted evidence regarding Los Chirisos' hunt for Mr. Funes in San Pedro Sula. They were silent on the fact that multiple family members were nearly drowned, had guns put in their mouths, guns held to their heads,  they were shot and threatened in order to find Mr. Funes. They also, in those instances of torture, received the address of his son who was in another town and threatened to go kidnap him if Mr. Funes did not return to his hometown. This gang is able to travel, and they demonstrated that after Mr. Funes fled. The board was completely silent on the fact that the gang went to San Pedro Sula, they questioned his landlady about him, and on a separate trip, so they were able to go multiple times, murdered his nephew, William, with whom he was living while he was in San Pedro Sula. This court has never posited and could never posit a test where one relocation automatically defeats a CAT claim and not account for changed circumstances and the development of the record such as when it was here, or where applicants would need to try and relocate multiple times. This is not the standard, and how could it be? How many times must one try and move? How long do you have to stay one step ahead of your torturers before it's considered enough? How many relatives need to be shot, drowned, or killed in order to find you? Furthermore, to justify the reversal of the IJ's past relocation finding based on anything beyond the three facts cited by the board in their decision is completely impermissible under Chenery. Regarding acquiescence, the board impermissibly found a new fact when they found that the Honduran military police officer was not who everyone, including DHS, said he was, and they gave no citation to anything in the record to justify this speculation. This fact finding was not allowed, and thus the board's quote-unquote finding on this matter is not due any deference. This court has already rejected the argument that any attempt to control non-government actors or any fear of any authorities at any time would categorically foreclose a finding of acquiescence. The IJ had found significant findings here regarding the torture and systematic murder of multiple family members of Mr. Funes. His brother almost died and then had to give up his address, and as mentioned, Los Chirisos were willing to travel to find Mr. Funes and his son. Finally, in defending the board's erroneous decision, the government ignores Chenery and takes that too far. They attempt to rehabilitate the board's decision on the basis of facts the board did not rely on. This court discussed this extensively in Cordova. This court cannot affirm the board on the basis of reasons that the board did not itself put forward. The board's decision must stand or fall on its own merits, not the arguments the government marshals at this juncture. The government bases large amounts of its argument on dicta and holding from other unpublished cases, including Larios Vargas, and in this case, your honor, substantial evidence does not support the board's decision, and it was replete with legal errors and complete silence on the facts of this case. It is not fair to say that the murder and rape and burning down of his brother's home was unrelated to Mr. Funes. He has lost most of his family there, and the fact that he has been in detention this whole time and has lost some contact with his family should not be held against him in terms of saying that it's enough to show that some family members survive in Honduras. In this case, due to the board's significant legal errors, their decision that is not supported by substantial evidence, we ask that this court remand this case to the board. Thank you, your honor. Thank you, Mr. Stanton. Mr. Stanton, thank you very much for your presentation. We're going to come down and greet counsel, and we'll ask that counsel in the next case give us a little time to prepare counsel's table for the next. We'll come down and greet counsel and proceed thereafter. Next case.
judges: Roger L. Gregory, Pamela A. Harris, Barbara Milano Keenan